UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY GRZYBOWSKI,

      Plaintiff,

v.

DAIMLERCHRYSLER SERVICES
NORTH AMERICA, L.L.C.,

      Defendant.
_____/

Case No. 05-71286
Honorable Patrick J. Duggan

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on May 17, 2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                U.S. DISTRICT COURT JUDGE

After Defendant terminated Plaintiff on November 5, 2003, Plaintiff filed this lawsuit alleging age and gender discrimination. Plaintiff alleges two counts of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA")[1] and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"),[2] and two counts of gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")[3] and

---

[1] 29 U.S.C. §§ 621-634.

[2] MICH. COMP. LAWS ANN. §§ 37.2101-2804.

[3] 42 U.S.C. § 2000e.

1

ELCRA.  Presently before the Court is Defendant's motion for summary judgment.  The Court held a hearing on Defendant's motion on May 11, 2006.

## I.    Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See id.* at 255.  The inquiry is whether the evidence

presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II.     Factual Background

In 1966, Plaintiff began working for Defendant as a hi-lo driver. Three months later, Plaintiff joined Defendant's Human Resources and Administrative Services Department. At the time of his termination, Plaintiff was a LEAD Analyst in that department. As a LEAD Analyst, Plaintiff was responsible for administering the logistics of Defendant's LEAD appraisal system by which high-level executives evaluate the performance of mid-level executives. To carry out his responsibilities, Plaintiff regularly used a computer software program called Microsoft Access. Plaintiff also utilized a data warehouse system called PeopleSoft and generated reports from that system on another program called Impromptu. At the time of Plaintiff's termination, Defendant was adopting a new software program for its appraisal system referred to as Lead IT and Plaintiff had received some training in that program. As a LEAD Analyst, Plaintiff also was responsible for documenting training opportunities for employees and arranging for employees to attend training classes.

Plaintiff assumed the LEAD Analyst position sometime in 2000, reporting to Matthias Zeuch. In 2001, Karen Cowan became Plaintiff's supervisor; although Zeuch remained in the department and was Cowan's supervisor. Five areas or groups comprised the Human Resources and Executive Services Department and each group was under the responsibility of a senior manager: Human Resources Operations; Learning and

Development; Purchasing; Facilities; and Executive and Organization Development. *See* Resp. Koseck Dep. at 20. Plaintiff's position fell within the last group. *See* Resp. Ex. L. Sometime in 2003, Lorne Todd Thomas became the senior manager of the Executive and Organizational Development group and began supervising Plaintiff. At this time, Thomas Guidugli was the Vice President of the entire Human Resources and Executive Services Department which, in 2003, included 78 employees. *See* Resp. Ex. R.

In 2003, Guidugli submitted a proposal for the department's 2004 budget. *See* Mot. Ex. F at 13 & Ex. G. In his proposal, Guidugli requested a headcount of 85 employees, which included five employees already slated for transfer to Guidugli's headcount: three existing employees from Defendant's Berlin, Germany office, an employee from "Inclusion," and an employee from "Cheers."[4] *See id*. Ex. G ¶¶ 6-7. Guidugli also requested a budget of $39.94 million. *See id*. ¶ 6. While the Executive Committee approved the increased responsibilities for the department set forth in Guidugli's 2004 budget, it only approved a headcount of 78 employees and a budget of $34.1 million. *See id*. Guidugli therefore concluded in or around October 2003, that the department needed to undergo a reduction in force. *See* Mot. Ex. G at 12-13 & 21-22

Guidugli then met with the senior managers of the department's five groups to inform them of his decision to execute a reduction in force. Guidugli directed each senior

---

[4]The Berlin employees were not included in the department's 78 headcount for 2003. *See* Resp. Ex. L. It is not clear, however, whether the two Inclusion and Cheers employees were included.

4

manager to assess his or her group and determine whether a reduction in force could be accomplished based on the group's responsibilities. *See id*. at 26; *see also* Resp. Thomas Dep. at 94-95. According to one senior manager, Guidugli indicated that the department's headcount had to be reduced by six. *See* Resp. Koseck Dep. at 46. The senior managers subsequently decided that one position should be eliminated from each group except Facilities and that Facilities, because of its larger size, should be reduced by three employees. *See* Resp. Koseck Dep. at 46. Each senior manager had the authority to decide which employee(s) in his or her group should be eliminated. *See* Resp. Thomas Dep. At 196-97.

Guidugli assigned Pam Koseck, the senior manager of the Human Resources group, to develop a uniform process for the senior managers to conduct or make decisions regarding the reduction in force in each of their groups. *See* Resp. Guidugli Dep. at 32. According to Koseck, she advised the senior managers to "take a look at the positions that they have within their organization and to determine what work they were going to need going forward with the number of people that they would have." *See* Resp. Koseck Dep. at 62. Koseck also recommended that the senior managers use a critical skills evaluation form to review their employees. *See id*. at 46-47. On this form, the senior managers ranked employees on five "critical skills": (1) Product/Process Knowledge; (2) Interpersonal Skills; (3) Communication Skills; (4) Analytical/Computer Skills; and (5) Time/Resource Management. *See id*. at 51-52; Resp. Ex. O.

Prior to receiving the critical skills evaluation form, Thomas conducted a general

5

overview of his staff, looking at each employee's responsibilities. *See* Resp. Thomas Dep. at 100. At the time, Thomas supervised four employees: Plaintiff (age 57), Lorraine Paoletti (age 34), JacquelineNorvell (age 59), and Karen Cowan (age 57). *See id*. at 121. Based on his initial evaluation, Thomas concluded that two employees, Plaintiff and Paoletti, were performing very similar work and that their positions possibly could be combined. *See id*. at 101.

When the reduction in force was initiated, Paoletti was a Communication and Program Coordinator. *See* Resp. Ex. N. The purpose of this position was "[t]o provide coordination and controlling related to programs of DCSA [DaimlerChrysler Services Academy] North America Leadership and Organizational Development areas." *See id*. Paoletti's responsibilities included coordinating program activities of North America DCSA Leadership and Organizational Development; acting as liaison with Communication and Events Department (Farmington Hills), Corporate Meeting Planning (Auburn Hills), and the Organization Department (Berlin) to manage DCSA North America events; and monitoring budget and providing administrative support to the Senior Manager of DaimlerChrysler Services Academy, North America– who at the time was Thomas. *See id*.

Prior to completing the critical skills evaluation forms for the employees in his group, Thomas spoke with the employees' previous supervisors and he reviewed the employees' last two annual performance appraisals. *See id*. at 133 & 135. Based on this information, as well as his own observations, Thomas completed the critical skills

evaluation forms.  Thomas ranked Plaintiff and Paoletti, on a scale from 1-4[5] as follows:

| Critical Skills | Plaintiff | Paoletti |
|---|---|---|
| **Product/Process Knowledge** | 3 | 3 |
| **Interpersonal Skills** | 2 | 3 |
| **Communication Skills** | 1 | 4 |
| **Analytical/Computer Skills** | 1 | 4 |
| **Time/Resource Management** | 3 | 4 |
| **Total** | 10 | 18 |

*See* Resp. Ex. P & T.  Ultimately Thomas decided that Paoletti was better qualified than Plaintiff to assume the combined position due to Paoletti's superior analytical/computer skills.  *See* Mot. Ex. K; Ex. C at 193-94.  As Thomas explained during his deposition:

> . . . the dependence on the systems for lead and for executive data management, because all of those systems were changing, that I was more confident that she would be able to stay on top of it.  That she was very thorough.  That I didn't have to follow up with her.  So I felt she had enough personal

---

[5]The ratings represented the following categories:

    1:    Does not possess the critical skill or is ineffective or marginally effective in applying the skill
    2:    Possesses the critical skill, but has not had an opportunity to apply the skill
    3:    Possesses the critical skill and effectively applies the skill
    4:    Possesses superior ability in applying the critical skill.

*See* Resp. Ex. O.

> responsibility to be relatively independent, or at least without constant supervision in that position, and I thought that it was going to get big enough that I needed to make sure that it was covered well.

*See* Mot. Ex. C at 193-94.

On November 3, 2003, Koseck and Thomas met with Plaintiff to inform him of his selection for the reduction in force.[6] Koseck informed Plaintiff that he could take an indefinite layoff or, due to his lengthy service with Defendant, special early retirement. Plaintiff chose the latter.

### III.   Applicable Law and Analysis

#### A.   Whether Plaintiff's Termination was Pursuant to a Reduction in Force

As will be discussed below, when a plaintiff is terminated pursuant to a reduction in force, he or she has a greater burden to show that the termination was discriminatory.

---

[6]In addition to Plaintiff, the following employees were terminated in the Human Resources and Executive Services Department as a result of the reduction in force:

| Name | Age as of Fall 2003 | Sex |
|---|---|---|
| Giovanna Payne-Smith | 36 | F |
| Roosevelt Shavers | 46 or 47 | M |
| Allan Darish | 50 or 51 | M |
| Christy Markin | 52 | F |
| Kim Zadrosny | 43 | F |

*See* Mot. Ex. I-K; Resp. Ex. L.

Relying on the Eighth Circuit's general description of reduction in force cases in *Hillebrand v. M-Tron Industries Inc.*, 827 F.2d 363 (8th Cir. 1987), Plaintiff contends that Defendant is not entitled to this "heightened standard of review" because there was no "economic necessity" driving Guidugli's decision to reduce the headcount of the Human Resources and Executive Services Department:

> Most cases simply assume that a reduction in force has occurred and analyze the evidence within that framework . . . When this occurs, the evidence generally demonstrates that the company had some kind of plan to reduce expenses by eliminating jobs. These plans generally include objective criteria by which to determine which jobs will be eliminated and often include objective evidence of a business decline . . .

827 F.2d at 367. The *Hillebrand* court, however, simply was explaining that in *most* cases courts assume a reduction in force has occurred because evidence demonstrates that the company had some plan to reduce expenses by eliminating jobs due to a business decline. 827 F.2d at 367-68. As the Eighth Circuit subsequently clarified, however, "[w]e know of no requirements . . . that a business must first founder on economic shoals before embarking upon such a plan." *Bashara v. Black Hills Corp.*, 26 F.3d 820, 824 (1994). Similarly, in the Sixth Circuit, a reduction in force need not be driven by "economic necessity." *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (1990). As the *Barnes* court described "[a] work force reduction situation occurs when *business considerations* cause an employer to eliminate one or more positions within the company." *Id.* (emphasis added).

In this case, business considerations led Guidugli to institute a work force

9

reduction. Specifically, the Executive Committee only approved a headcount of 78 employees in the Human Resources and Executive Services Department for 2004. As Guidugli explained, based on the increased operating responsibilities of his department for 2004 and the rejection of his 2004 budget request for an increased headcount, "there was a significant gap and the need to restructure and reorganize [the department's] resources." *See* Mot. Ex. F at 12.

Based on Exhibit R to his Response brief, Plaintiff argues that the department only had 78 employees in 2003 and therefore no employees needed to be eliminated as a result of the Executive Committee's decision. Defendant explains, however, that Exhibit R only reflects "on-roll" employees and does not include the three Berlin employees, one Cheers employee, and one Inclusion employee already slated for transfer to Guidugli's staff when he submitted his budget. Thomas also was not included in the count on Exhibit R.

Relying on *Baker v. Siemens Energy Automations*, 820 F. Supp. 1050 (D. Ohio 1993), Plaintiff also argues that a reduction in force did not occur because Defendant simply reassigned his duties to a younger, female employee– Paoletti. Contrary to Plaintiff's reading of *Baker*, however, the fact that the plaintiff's duties were reassigned to three younger supervisors was not a reason why the district court in that case concluded that the plaintiff had not been terminated as part of a reduction in force. Instead the Court relied on the fact that the decision maker decided to terminate the plaintiff *before* upper management decided that a reduction in force was necessary and

the fact that the decision maker failed to mention the reduction in force as a reason for the plaintiff's termination when he terminated the plaintiff– something the court found a reasonable fact finder would expect a employer to do if the termination in fact was part of a reduction in force. *Baker*, 820 F. Supp. at 1055.

In fact, the *Baker* court specifically noted that "a reduction in force generally is involved when a fired employee's work is redistributed among remaining workers." *Id*. As the Sixth Circuit provided in *Barnes* to clarify what constitutes a true work force reduction case:

> An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d at 1465. No one was hired to perform Plaintiff's duties; nor was anyone reassigned to Plaintiff's position. Instead Defendant assigned Paoletti to perform most of Plaintiff's duties *in addition to* her own.

This Court therefore concludes that Defendant eliminated Plaintiff as part of a work force reduction.

### B.     Proof of Age and Gender Discrimination

The ADEA, ELCRA, and Title VII prohibit employers from discharging employees based on their age and/or gender. 29 U.S.C. § 623(a); MICH. COMP. LAWS

ANN. § 37.2202; 42 U.S.C. § 2000e.  An employee may establish a claim under these statutes by offering either direct or circumstantial evidence of discrimination.  *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)(citation omitted)(ADEA); *White v. Columbus Metro. Housing Auth.*, 424 F.3d 232, 238 (6th Cir. 2005)(Title VII);  *Sniecinski v. Blue Cross and Blue Shield of Mich.*, 469 Mich. 124, 132, 666 N.W.2d 186, 192 (2003)(ELCRA).  As Plaintiff acknowledged at his deposition, he lacks direct evidence to show that his termination was due to his age and/or gender.[7]  *See* Mot. Ex. A at 122-23.  Plaintiff concedes that Thomas never commented on his age or gender.  *Id*. at 124.  Thus Plaintiff must offer circumstantial evidence to prove his case.

      i.      **Prima Facie Case**

When a plaintiff proves his or her case through circumstantial evidence, he or she begins by establishing a prima facie case of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)(citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

---

[7]In a footnote to his response, Plaintiff identifies comments made during the reduction process that he believes reveal age stereotypes: (1) Thomas' statement that he preferred Paoletti because he believed she would be more willing to take on new responsibility and stay on top of system changes; and (2) Thomas' statement that Paoletti has "high potential" and is a "fast learner."  *See* Resp. at 19 n.33. The Court concludes that these statements are not direct evidence of discrimination as they do not relate to age or gender and a fact finder would have to draw inferences to conclude that the stereotype "you can't teach an old dog new tricks"– as Plaintiff suggests– is at work.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)(quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)(explaining that "'direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'")

252-53, 101 S. Ct. 1089 (1981)). Once the plaintiff establishes a prima facie case of discrimination, an inference or rebuttable presumption of discrimination arises. *Id.* In order to rebut this inference, the employer must "articulate some legitimate, non-discriminatory reason" for its conduct. *Id.* If the employer articulates such a reason, "'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* at 414-15 (quoting *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1089). "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)(en banc)(quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

  Generally, a plaintiff must show the following in order to establish a prima facie case of discrimination: (1) that he or she is a member of a protected class; (2) that he or she was qualified to perform the job; and (3) that he or she was discharged. *Barnes*, 896 F.2d at 1465. In a work force reduction case, however, the *Barnes* court concluded that these factors alone are insufficient to establish a prima facie case of discrimination because "'the most common legitimate reasons' for the discharge [in such cases] are the work force reductions" and not necessarily discriminatory animus. *Id.* Thus in a work force reduction case, a plaintiff must present "additional direct, circumstantial, or

13

statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id*. (citations omitted).

Plaintiff relies on the following "additional evidence" to prove his prima facie case. First, that a less qualified, younger, female employee was retained to perform his responsibilities. Second, statistical evidence which Plaintiff asserts demonstrates that Defendant engaged in a pattern of discrimination against older workers under the guise of a "reduction in force." Defendant responds that Plaintiff cannot show that he was more qualified than Paoletti.[8] Defendant also challenges the reliability of Plaintiff's statistical analysis. The Court, however, finds it unnecessary to resolve whether Plaintiff presents sufficient additional evidence to establish his prima facie case, because the Court finds that he fails to create a triable issue of fact as to whether Defendant's explanation for his discharge was a pretext for discrimination.

### ii. Pretext

Thomas testified that his primary reason for selecting Paoletti, rather than Plaintiff, to fill the combined position in his group was her superior computer skills and demonstrated ability to understand systems concepts. To demonstrate that this proffered reason is a pretext for discrimination, Plaintiff argues that it has no basis in fact and that it

---

[8]Defendant also argues that Plaintiff cannot prove the second prong of his prima facie case– i.e. that he was qualified for the job. To make this point, however, Defendant primarily relies on the same considerations Thomas used to justify eliminating Plaintiff. "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003).

was insufficient to motivate his discharge. With respect to his first argument, Plaintiff contends that when Thomas completed Plaintiff's and Paoletti's critical evaluation forms, he manipulated the scores to justify terminating Plaintiff. To explain his second argument, Plaintiff states: "The process leading to [Plaintiff's] termination was unusual and biased from the very beginning. As stated earlier, a proposed and inflated budged was used to create 'urgency' that did not exist, to reduce more employees than even the defense contends was necessary." *See* Resp. at 23. As discussed previously, there is evidence to support Guidugli's decision to implement a reduction in force and Plaintiff's disagreement with Guidugli's business decision is insufficient to demonstrate pretext.

With respect to Plaintiff's other argument, Thomas testified that he did not compare each employee's score on the critical skills evaluation form in deciding who to eliminate. *See* Mot. Ex. C at 206-08. Instead, he used the form as a tool to gather his thoughts about each person's performance in their particular position. *See id*. As he explained further, his decision "wasn't based on an eighteen compared to a ten. It was based on the thought process behind who would be most qualified." *See id*. at 208. In any event, Thomas provided reasoned explanations for why he gave Paoletti and Plaintiff the ratings that he did. *See id*. at 160-90. Plaintiff's disagreement with those reasons– particularly where the record indicates that other supervisors agreed with Thomas' assessment– does not render them false.

Based on the fact that Thomas primarily focused on Paoletti's and Plaintiff's analytical/computer skills in making his decision, the Court will focus on his rankings in

that category. Thomas ranked Plaintiff a one and Paoletti a four. On Plaintiff's critical skills evaluation form, Thomas explained his ranking for Plaintiff as follows:

> Greg requires a lot of direction when it comes to computer skills which is a large part of his responsibility. Those things he knows how to do, he does well. But in terms of exploiting the benefits of Impromptu, for example, even after attending the courses repeatedly still do [sic] not seem to be possible for him.

*See* Resp. Ex. P. Plaintiff challenges this assessment, arguing for example that he rarely needed to use Impromptu.[9] Plaintiff's disagreement with Thomas' assessment, however, does not render the assessment necessarily pretextual.

In fact Thomas was not the only supervisor who believed that Plaintiff's computer skills were insufficient. For example, on his 2001 and 2002 appraisals, Karen Cowan (Plaintiff's supervisor at the time) commented that he needed to improve his computer skills. *See* Mot. Ex. A, att. to dep. Cowan wrote in 2001: "Greg [sic] job requires computer expertise, and unfortunately, Greg has admitted that he is not comfortable with computers." *Id*. A year later Cowan wrote: "Greg need [sic] to continue improving his computer skills – especially Access and Impromptu. Impromptu and Access are a part of his daily worklife and proficiency in both are needed." *Id*. Zeuch testified at his deposition that he had two major criticisms of Plaintiff, both based on Plaintiff's computer skills:

---

[9]Notably, at his deposition, Plaintiff acknowledged that he was not using the full benefits of Impromptu. *See* Mot. Ex. A at 200.

16

> One, a major criticism was– two major things.  One was more
> that coming in with all the questions for kind of new
> processes and so forth.  Optimization and data was – his
> computer skills.  I did a lot myself. The whole programming
> and changes of the system.  He was like a user of the system,
> but not somebody who really could further develop things and
> change things of his own, and I constantly tried to encourage
> him to go more into these topics in order to learn more how
> these things worked to alleviate also my things because I was
> too much operationally involved to his lack of skills in this
> area and also he did not acquire them over the years.

*See* Mot. Ex. B at 129-30.  Plaintiff would be hard-pressed to challenge these criticisms, in light of the fact that during his deposition he acknowledged on a number of occasions weaknesses in his computer skills.  *See, e.g.,* Mot. Ex. A at 100-02, 161, 168 & 200.

Thomas gave Paoletti a four on her critical skills evaluations form with regard to analytical/computer skills, noting that she "is an extremely quick study and a self-starter when addressing system issues that are difficult to manage."  *See* Resp. Ex. T.  This view was expressed by Paoletti's other supervisors.  At his deposition, Christopher Kaefer described Paoletti's computer skills as follows: "What I remember her being good at is system related.  So I remember her, you know, doing Excel.  Not templates, but, you know, she was working Excel and other computer systems she was very good at . . . She was excellent – very very good at it."  *See* Reply Ex. R at 47-48.

Plaintiff argues that "[t]here is no real contest . . . that Defendant retained the less qualified employee," noting that when Paoletti "drew her first breath" Plaintiff already "had nearly three years of Human Resources experience" with Defendant.  *See* Resp. at 19.  Plaintiff also points out that his education exceeds Paoletti's and that her previous

17

work history was as a secretary. *See id.* As Defendant notes in response, however, neither a master's degree nor human resources experience was a qualification for Plaintiff's job or for the combined job Paoletti assumed. *See* Resp. Ex. M & N. Even if Paoletti's prior position was as a secretary– which in fact is not completely accurate– this fact does not discredit Defendant's stated legitimate reason for choosing Paoletti over Plaintiff.

In sum, Plaintiff argues that Defendant's proffered nondiscriminatory reason for eliminating him during the reduction in force was pretextual because it had no basis in fact. Ample evidence, however, supports Thomas' criticisms of Plaintiff's computer skills and Thomas' belief that computer skills were critical to Plaintiff's job responsibilities. Plaintiff may disagree with Thomas' assessment; however pretext requires more than second guessing an employer's "reasonably informed and considered" decision that demonstrates an "honest belief" in the proffered reason. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Plaintiff must produce evidence from which a jury reasonably could reject Defendant's proffered explanation *and* infer that Defendant discriminated against him based on age and/or gender. Plaintiff has not presented evidence from which a jury could reasonably reach either conclusion.

Accordingly,

**IT IS ORDERED**, that Defendant's motion for summary judgment is **GRANTED**.

                                          s/PATRICK J. DUGGAN
                                          UNITED STATES DISTRICT JUDGE

Copies to:
Barry S. Fagan, Esq.
Thomas G. Kienbaum, Esq.
Julia Turner Baumhart, Esq.